## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEN CROWLEY, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>   v.<br><br>BOJANGLES', INC., WILLIAM A. KUSSELL, STEVEN J. COLLINS, JOHN E. CURRIE, CHRISTOPHER J. DOUBRAVA, TOMMY L. HADDOCK, ROBERT F. HULL, JR., STARLETTE JOHNSON, JAMES R. KIBLER, MARK A. ROWAN, and STEVEN M. TADLER,<br><br>          Defendants. | Case No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMAND |

Plaintiff Ken Crowley ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of Bojangles', Inc. ("Bojangles'" or the "Company") against Bojangles' and the members of Bojangles' Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Bojangles' will be acquired by Durational Capital Management LP ("Durational") and The Jordan Company, L.P. ("TJC") through their affiliate Walker Parent, Inc.

("Walker") and Walker's wholly owned subsidiary Walker Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On November 11, 2018, Bojangles' issued a press release announcing it had entered into an Agreement and Plan of Merger dated November 9, 2018 (the "Merger Agreement") to sell Bojangles' to Durational and TJC.   Under the terms of the Merger Agreement, each Bojangles' stockholder will receive $16.10 in cash for each share of Bojangles' common stock they own (the "Merger Consideration").

3.      On December 10, 2018, Bojangles' filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that Bojangles' stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Bojangles' financial projections, relied upon by the Company's financial advisors, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch") and Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), in their financial analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by BofA Merrill Lynch and Houlihan Lokey; (iii) the background process leading to the Proposed Transaction; and (iv) potential conflicts of interest faced by BofA Merrill Lynch and Company insiders.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Bojangles' stockholders need such information in order to make a fully informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

4.      In short, unless remedied, Bojangles' public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to

- 2 -

enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

8.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Bojangles'.

9.     Defendant Bojangles' is a Delaware corporation, with its principal executive offices located at 9432 Southern Pine Boulevard, Charlotte, North Carolina 28273.   The Company is a highly differentiated and growing restaurant operator and franchisor dedicated to serving customers high-quality food made from its Southern recipes, including breakfast served "all day, every day."  Founded in 1977 in Charlotte, N.C., Bojangles' serves menu items such as made-from-scratch biscuit breakfast sandwiches, hand-breaded bone-in chicken, flavorful fixin's (sides) and Legendary Iced Tea®.  At July 1, 2018, Bojangles' had 766 system-wide restaurants,

of which 325 were company-operated and 441 were franchised restaurants, primarily located in the Southeastern United States.   Bojangles' common stock trades on the NASDAQ Global Market under the ticker symbol "BOJA."

10.     Defendant William A. Kussell ("Kussell"), has served as Non-Executive Chairman of the Board since June 2016 and a director of the Company since August 2011.  Since January 2010, Kussell has served as an operating partner of, and a consultant to, advent International Corporation ("Advent").

11.     Defendant Steven J. Collins ("Collins") has been a director of the Company since August 2011.  Collins is also a managing director and serves on the board of Advent.

12.     Defendant John E. Currie ("Currie") has been a director of the Company since April 2015.

13.     Defendant Christopher J. Doubrava ("Doubrava") has been a director of the Company since April 2014.   Since January 2015, Doubrava has served as a vice president of Advent.

14.     Defendant Tommy L. Haddock ("Haddock") has been a director of the Company since August 2011.

15.     Defendant Robert F. Hull, Jr. ("Hull") has been a director of the Company since September 2017.

16.     Defendant Starlette Johnson ("Johnson") has been a director of the Company since March 2016.

17.     Defendant James R. Kibler ("Kibler") has served as Interim Chief Executive Officer ("CEO") and Interim President of the Company since March 2018 and as a director of the Company since February 2014..

- 4 -

18.     Defendant Mark A. Rowan ("Rowan") has been a director of the Company since April 2017.

19.     Defendant Steven M. Tadler ("Tadler") has been a director of the Company since August 2011.  Since 1993, Tadler has served as managing partner of Advent and is a member of Advent's board of directors.

20.     Defendants identified in paragraphs 10-19 are referred to herein as the "Board" or the "Individual Defendants."

### OTHER RELEVANT ENTITIES

21.     Durational, founded in 2017, is an investment firm that invests in high quality consumer companies.

22.     TJC, founded in 1982, is a middle-market private equity firm that has managed funds with original capital commitments in excess of $11 billion since 1987 and a 36-year track record of investing in and contributing to the growth of many businesses across a wide range of industries including Industrials, Transportation & Logistics, Healthcare, Consumer, and Telecom, Technology & Utility.

23.     Walker is a Delaware corporation that is indirectly owned by Durational Walker LP, an investment fund affiliated with Durational and The Resolute Fund IV, L.P., an investment fund affiliated with TJC.  It is contemplated that at or prior to consummation of the Proposed Transaction, TEI Investment Pte. Ltd. ("TEI") will become an additional indirect owner of Walker.

24.     Merger Sub is a Delaware corporation and a wholly owned subsidiary of Walker.

25.     TEI is a private limited company affiliated with GIC Special Investments PTE. Ltd., the private equity investment arm of GIC Pte. Ltd. ("GIC").  GIC is a global investment firm established in 1981 to manage Singapore's foreign reserves.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Bojangles' common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

27.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

28.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of December 6, 2018, there were 37,548,674 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Bojangles' or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

29.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

a)      Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b)      Whether the Individual Defendants have violated Section 20(a) of the

Exchange Act; and

          c)      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

        30.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

        31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

        32.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

        33.    Bojangles' is a highly differentiated and growing restaurant operator and franchisor dedicated to serving customers high-quality, craveable food made from its Southern recipes.  Since 1977, Bojangles' has become an iconic brand with a cult-like following due to its famous, made-from-scratch biscuits baked every 20 minutes, fresh, never-frozen bone-in fried chicken, unique fixin's and Legendary Iced Tea.

        34.    In fiscal 2017, Bojangles' 325 company-operated and 439 franchised restaurants, primarily located in the Southeastern United States, generated approximately $1.3 billion in system-wide sales, representing $518.4 million in company-operated restaurant revenues and $760.0 million in franchise sales, which contributed $29.1 million in franchise royalty and other

franchise revenues.  Over this same period, its restaurants generated a system-wide AUV of approximately $1.8 million, among the highest in the quick-service restaurant ("QSR") and fast-casual segments.  Bojangles' is especially known by customers for its breakfast offerings and generated, on average, approximately $620,000 in fiscal 2017 per company-operated restaurant before 11:00 a.m.

35.     The U.S. restaurant industry is divided into two segments: full service and limited service.  Full service is comprised of the casual dining, mid-scale and fine dining sub-segments.  Bojangles' operates within the limited service segment ("LSR"), which is comprised of the QSR and fast-casual sub-segments.  QSRs are defined by Technomic, Inc. ("Technomic"), a research and consulting firm servicing the food and foodservice industry, as traditional "fast-food" restaurants with average check sizes of $3.00-$8.00.  Fast-casual is defined by Technomic as a limited or self-service format with average check sizes of $8.00-$12.00 that offers food prepared to order within a generally more upscale and developed establishment.  Bojangles' restaurants combine elements of both QSRs and fast-casual restaurants.  According to Technomic, 2016 sales for the total LSR category increased 4.5% from 2015 to $268 billion.

36.     According to Bojangles' Form 10-K filed with the SEC on March 8, 2018, the Company is well-positioned to benefit from a number of culinary and demographic trends in the United States, namely:

> *Growing Breakfast Daypart*: According to MillerPulse, total morning meal dollars grew from $53 billion in 2011 to $75 billion in 2017, representing a CAGR of 6.0%. In addition, sales for the QSR morning meal daypart grew from $42 billion in 2011 to $58 billion in 2017, representing a CAGR of 6.0%. Several factors are driving growth in the breakfast daypart, including more extensive menu offerings and consumers' desire for value, portability and convenience. Consumers' breakfast eating habits tend to be more habitual than other meals because breakfast is part of many consumers' morning routines.

*Increasing Chicken Category*: In 2016, the chicken menu category for LSRs grew 7.5% from 2015, outpacing the broader LSR category, according to Technomic.

*Population Growth in Our Markets*: Since 2000, population growth in our key markets has exceeded the U.S. national average. According to the U.S. Census Bureau, growth in the Georgia, North Carolina, South Carolina, Virginia and Tennessee populations from 2000 to 2017 was on average 23.4%, as compared to 15.4% population growth in the U.S. over that same period.

37.     On March 6, 2018, the Company announced financial results for the 14-week fourth fiscal quarter and 53-week fiscal year ended December 31, 2017.  Total revenues increased 6.2% to $148.1 million from $139.4 million in the prior year fiscal quarter and increased 2.9% to $547.4 million from $531.9 million in the prior fiscal year.  Net income was $48.8 million as compared to $9.8 million in the prior year fiscal quarter and $72.0 million as compared to $37.7 million in the prior fiscal year.

38.     On May 8, 2018, the Company announced financial results for the 13-week first fiscal quarter ended April 1, 2018.  Highlights included total revenues increasing 2.7% to $137.5 million from $133.9 million in the prior year fiscal quarter.  Defendant Kibler commented on the successful quarter, stating:

> We are pleased our system-wide comparable restaurant sales trends improved sequentially during the first fiscal quarter 2018 relative to the fourth fiscal quarter 2017 and turned slightly positive in our March fiscal period. Going forward, our key areas of focus will be on well-run restaurants, communicating and promoting our core menu items, and incorporating these key signature products into our value messaging. We believe that these efforts will resonate with our customers.

39.     On August 2, 2018, the Company announced financial results for the 13-week second fiscal quarter ended July 1, 2018 and also announced the launch of a restaurant portfolio optimization program.  Highlights included total revenues increasing 2.7% to $140.5 million from $136.8 million in the prior year fiscal quarter.  Defendant Kibler commented on the successful quarter, stating:

Our continued focus on well-run restaurants is best reflected in the progress we are making on staffing and training, improving speed, accuracy and quality, and promoting signature menu items with value messaging. We are further encouraged that system-wide comparable restaurant sales in the second fiscal quarter of 2018 improved sequentially compared to the first fiscal quarter of 2018 and that our core breakfast daypart strengthened. Our hard work over the past several months is clearly beginning to resonate with customers.

We are also optimizing our restaurant portfolio by closing some underperforming company-operated restaurants, refranchising select company-operated restaurants, and slowing system-wide expansion by limiting company development mainly to core markets while franchise development continues in both the core and adjacent markets. We believe these efforts will positively impact our Adjusted EBITDA and Adjusted Net Income during the remainder of fiscal year 2018 and beyond.

40.     Most recently, on November 8, 2018, the Company announced financial results for the 13-week third fiscal quarter ended September 30, 2018 and also provided an update on its restaurant portfolio optimization program.   Highlights included system-wide comparable restaurant sales increasing 0.4%, company-operated comparable restaurant sales increasing 0.1% and franchised comparable restaurant sales increasing 0.7%.   Additionally, total revenues increased to $138.7 million from $136.0 million, net income increased to $8.1 million as compared to $6.5 million and Adjusted EBITDA increased to $16.5 million as compared to $16.1 million in the prior year fiscal quarter.   Defendant Kibler commented on the successful quarter, stating:

We are pleased the Bojangles'® system returned to positive comparable restaurant sales during the third fiscal quarter despite the negative impact associated with Hurricane Florence in September.

We believe our back to basics strategy of operating 'well-run restaurants' is elevating customer perceptions of Bojangles'. We are enhancing customers' total brand experience through staffing and training initiatives, improving speed of service at the drive-thru, promoting high-quality signature menu items with value messaging, and building out our technological capabilities to support the use of our new mobile app and delivery test.

**The Sale Process**

41.     Between October 2017 and January 2018, several third parties, including Durational, a multinational corporation in the QSR sector, referred to in the Proxy Statement as "Strategic A," and a private equity investment firm referred to in the Proxy Statement as "Sponsor B," informally contacted several members of the Board affiliated with Bojangles' majority stockholder, Advent, to inquire about the Company's potential interest in a strategic transaction.

42.     On January 10, 2018, Bojangles' executed a confidentiality agreement with Strategic A.

43.     Based upon the preliminary inbound inquiries received in late January and early February 2018, members of the Board discussed meeting with investment banking firms to explore a potential engagement of a financial advisor to assist the Board in its decision-making process related to exploring potential strategic alternatives.

44.     On February 9, 2018, defendant Kussell, Laura Roberts, Bojangles' Vice President, General Counsel, Secretary and Compliance Officer, and three members of the Board, defendants Johnson, Hull, and Doubrava, participated in a call to discuss the various preliminary inbound inquiries received through such date with respect to a potential strategic transaction involving the Company.

45.     On or around February 25, 2018, the Company received a letter from Strategic A dated February 23, 2018, expressing potential interest in a strategic transaction involving the Company and requesting additional due diligence materials.

46.     At the Board meeting held on February 27, 2018, the Board approved the formation, for efficiency purposes, of a sub-committee of the Board ("Strategic Alternatives Sub-

Committee") to receive any potential indications of interest in the Company, select advisors in connection with the same, take other actions appropriate to evaluate strategic alternatives, and then report back to the full Board, as necessary. The Strategic Alternatives Sub-Committee was comprised of defendants Johnson, Hull, Doubrava, Kussell, and Currie.

47.     On or around March 24, 2018, Sponsor B contacted defendants Kibler and Hull to provide an unsolicited expression of potential interest with respect to a strategic transaction involving the Company, which was followed by a written letter to the Company dated March 28, 2018.  Thereafter, on April 2, 2018, Sponsor B submitted to the Company a preliminary non-binding indication of potential interest with respect to a strategic transaction involving the Company at a per share price range of $14.50 to $16.00.

48.     On April 30, 2018, at Durational's request, defendant Doubrava met with Durational. At the meeting, Durational expressed interest in a strategic transaction involving the Company and indicated that certain affiliates of Durational were stockholders of the Company. Defendant Doubrava informed Durational that any further communication should be directed to defendant Hull, the Chair of the Strategic Alternatives Sub-Committee.

49.     On May 15, 2018, Durational submitted a preliminary non-binding indication of potential interest with respect to a strategic transaction involving the Company at a per share price of $17.50.

50.     On June 6 and June 7, 2018 the Board met and discussed the status of various preliminary inbound inquiries and expressions of potential interest with respect to a strategic transaction involving the Company, including those received from Durational, Strategic A, Sponsor B, and a private equity investment firm referred to in the Proxy Statement as "Sponsor C."

51.     On June 27, 2018, Bojangles' executed a confidentiality agreement with Durational.

52.     During its July 2, 2018 special telephonic meeting, the Board discussed potential strategic alternatives, including the prospects for pursuing an independent strategy contemplated by the Company's standalone plan.

53.     Between July 17 and July 24, 2018, defendants Kibler and Jordan and BofA Merrill Lynch met with each of Strategic A, Sponsor B, and Sponsor C, after such parties had executed confidentiality agreements, to discuss each party's potential interest with respect to a strategic transaction involving the Company.

54.     During its meeting held on July 31, 2018, the Board determined to, among other things, commence a confidential, exploratory process to gauge potential interest by third parties in a strategic transaction involving the Company, and BofA Merrill Lynch to assist the Company and the Board in the consideration of strategic alternatives, including evaluating its prospects under the Company's standalone plan and exploring potential interest in the Company.

55.     Thereafter, BofA Merrill Lynch confidentially approached 23 parties, including strategic parties and financial sponsors (which number does not include Durational, Strategic A, Sponsor B, and Sponsor C) in mid-August 2018 with the intent to gauge such parties' respective potential interest in a strategic transaction involving the Company.  Throughout August and early September 2018, the Company negotiated confidentiality agreements with the parties approached by BofA Merrill Lynch, including a private equity investment firm referred to in the Proxy Statement as "Sponsor D."  The Company ultimately executed 22 confidentiality agreements.

56.     On September 4, 2018, Sponsor B informed representatives of BofA Merrill Lynch that it was no longer interested in pursuing a strategic transaction involving the Company.

On September 11, 2018, Strategic A submitted a preliminary non-binding indication of potential interest with respect to a strategic transaction involving the Company at a per share price range of $17.00 to $19.00.

57.     On September 12, 2018, Sponsor D submitted a preliminary non-binding indication of potential interest with respect to a strategic transaction involving the Company at a per share price range of $15.50 to $16.50.

58.     On September 28 and again on September 30, 2018, defendant Hull received confirmation from Durational that its updated indication of potential interest would reflect a decrease in the per share price from $17.50.

59.     On October 1, 2018, Sponsor D informed representatives of BofA Merrill Lynch that it was no longer interested in pursuing a strategic transaction involving the Company.  On the same date, BofA Merrill Lynch provided Strategic A with an additional process letter requesting a definitive, binding proposal by October 29, 2018.

60.     Later on October 1, 2018, the Company received an updated indication of potential interest from Durational and TJC with respect to a strategic transaction involving the Company at a per share price of $15.50.

61.     On October 14, 2018, Strategic A informed representatives of BofA Merrill Lynch that it was no longer interested in pursuing a strategic transaction involving the Company.

62.     On October 15, 2018, defendant Hull received an unsolicited preliminary non-binding indication of potential interest with respect to a strategic transaction involving the Company from an investment fund referred to in the Proxy Statement as "Sponsor E" at a per share price equal to a 30% premium added to the 60-day stock price average.  On October 16, 2018, the Company executed a confidentiality agreement with Sponsor E.

63.     On October 17, 2018, Durational and TJC submitted a revised indication of potential interest at a per share price of $16.10.

64.     On October 29 and October 30, 2018, the Board met and discussed the potential engagement of Houlihan Lokey as an additional financial advisor to the Company to provide a fairness opinion in addition to the fairness opinion to be provided by BofA Merrill Lynch in anticipation of entering into a definitive agreement providing for the purchase of the Company by Durational and TJC.

65.     On November 2, 2018, the Strategic Alternatives Sub-Committee convened and BofA Merrill Lynch answered questions relating to the preliminary valuation analysis of the Company provided by BofA Merrill Lynch at the October 29, 2018 meeting.

66.     The next day, the Board engaged Houlihan Lokey.

67.     On November 5, 2018, the financial advisor of Durational and TJC confirmed that the per share price of $16.10 was Durational's and TJC's best and final offer and noted that Durational and TJC were not prepared to transact at any higher price.

68.     On the night of November 5, 2018, the Board met and BofA Merrill Lynch and Houlihan Lokey delivered their fairness opinions and the Board determined to enter into the Merger Agreement with Durational and TJC.

69.     Prior to the opening of U.S. stock markets on November 6, 2018, Bojangles', Durational and TJC issued a joint press release publicly announcing their entry into the Merger Agreement.

**The Proposed Transaction**

70.     On November 6, 2018, Bojangles' issued a press release announcing the Proposed Transaction, which states, in relevant part:

**CHARLOTTE, N.C. —November 6, 2018** — Bojangles', Inc. (Bojangles', the "Company") (NASDAQ: BOJA) today announced that it has entered into a definitive agreement to be acquired by Durational Capital Management LP and The Jordan Company, L.P. Under the terms of the agreement, Durational Capital Management LP and The Jordan Company, L.P. will acquire the Company in an all cash transaction. Bojangles' stockholders will receive $16.10 per share, representing a 39% premium to the closing share price of February 12, 2018, a day prior to initial speculation regarding a potential transaction involving Bojangles' and a premium of approximately 30% to the 90-day volume weighted average price ending on February 12, 2018. The offer represents a 15% premium to the closing share price of September 27, 2018, a day prior to a published report that Bojangles' is exploring strategic alternatives.

**Transaction Details**

The acquisition, which has been unanimously approved by Bojangles' Board of Directors, is subject to stockholder approval and other customary closing conditions. Concurrently with the execution of the acquisition agreement, Bojangles' majority stockholder executed a customary voting agreement whereby it agreed (among other things) to vote its shares in favor of the acquisition. The transaction is expected to be completed in the first quarter of fiscal year 2019. Upon closing of the transaction, Bojangles' will continue to be operated as an independent, privately-held company and will remain based in Charlotte, N.C.

**Statements by Randy Kibler and William Kussell, Bojangles'**

"For the Bojangles' family of employees, franchisees, and our customers, today's announcement represents an exciting next phase for this great brand. The new ownership group is committed to maintaining the qualities of this brand that have sustained it for over four decades," said Randy Kibler, Bojangles' Interim President and CEO.

"In consultation with our outside advisors, the Board of Directors has been evaluating several strategic alternatives over the last several months. We are confident that this agreement offers a promising opportunity to realize the highest value for our stockholders while providing a strong path forward for the Bojangles'® brand, its employees, franchisees, and loyal customers," said William A. Kussell, Director and Non-Executive Chairman of Bojangles'.

**Statements by Durational Capital Management and The Jordan Company**

"Bojangles' is an iconic brand with an authentic Southern heritage and a deeply loyal following," said Eric Sobotka, Managing Partner at Durational Capital Management. "We have admired the brand and its high quality and craveable food for years, and we look forward to partnering closely with the employees and franchisees to drive its future growth and continued success."

"Bojangles' has a differentiated offering, a talented team of employees and dedicated franchisees that are committed to their businesses and their communities," said Ian Arons, Partner at The Jordan Company. "We are excited to invest in a company with such great growth potential, and we believe that with our and our partners' support, Bojangles' will be well-positioned for long-term success."

.

## Insiders' Interests in the Proposed Transaction

71.     Bojangles' insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Bojangles'.

72.     Notably, Bojangles' directors and executive officers stand to reap substantial financial benefits for securing the deal with Durational and TJC.  The Merger Agreement provides for the accelerated vesting, cancellation and cash-out of Bojangles' equity awards.  The following table sets forth the value of each of the Company's executive officers and non-employee directors' shares and equity awards that are outstanding as of December 7, 2018.

| Name | Shares Underlying Vested In-the-Money Bojangles' Stock Options (#) | Expected Value of Vested In-the-Money Bojangles' Stock Options ($)[1] | Shares Underlying Unvested In-the-Money Bojangles' Stock Options (#) | Expected Value of Unvested In-the-Money Bojangles' Stock Options ($)[1] | Total Expected Value of In-the-Money Bojangles' Stock Options ($)[1] |
|---|---|---|---|---|---|
| **Non-Employee Directors[2]** | | | | | |
| William A. Kussell[3] | — | — | 230,888 | $ 3,248,594 | $ 3,248,594 |
| **Executive Officers** | | | | | |
| James R. Kibler[4] | — | — | 339,904 | $ 4,782,449 | $ 4,782,449 |
| M. John Jordan[5] | — | — | 263,388 | $ 3,287,594 | $ 3,287,594 |
| Laura Roberts | — | — | 25,000 | $ 30,000 | $ 30,000 |
| Jayson Romeo[6] | 35,903 | $ 275,735 | 29,000 | $ 34,800 | $ 310,535 |

| Name | Shares Underlying Restricted Stock Units | Total Expected Value of Restricted Stock Units ($) |
|---|---|---|

|  | (#) |  |  |
|---|---|---|---|
| **Non-Employee Directors**[1] |  |  |  |
| Steven J. Collins | 3,355 | $ | 54,016 |
| John E. Currie | 3,355 | $ | 54,016 |
| Tommy L. Haddock | 3,355 | $ | 54,016 |
| Robert F. Hull, Jr. | 3,355 | $ | 54,016 |
| Starlette B. Johnson | 3,355 | $ | 54,016 |
| William A. Kussell | 3,355 | $ | 54,016 |
| Mark A. Rowan | 3,355 | $ | 54,016 |
| **Executive Officers** |  |  |  |
| James R. Kibler | 8,389 | $ | 135,063 |
| M. John Jordan | 32,188 | $ | 518,227 |
| Laura Roberts | 21,438 | $ | 345,152 |
| Jayson Romeo[2] | 25,274 | $ | 406,911 |

**The Proxy Statement Contains Material Misstatements and Omissions**

73.     The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Bojangles' stockholders.   The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction or seek appraisal.

74.     Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Bojangles' financial projections, relied upon by the Company's financial advisors, BofA Merrill Lynch and Houlihan Lokey, in their financial analyses; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by BofA Merrill Lynch and Houlihan Lokey; (iii) the background process leading to the Proposed Transaction; and (iv) potential conflicts of interest faced by BofA Merrill Lynch and Company insiders.  Accordingly, Bojangles' stockholders are being asked to make a voting or appraisal

decision in connection with the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Bojangles' Financial Projections***

75.     The Proxy Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

76.     First, the Proxy Statement omits material information regarding Bojangles' management's financial projections that were provided to and relied upon by the Company's financial advisors BofA Merrill Lynch and Houlihan Lokey in connection with their financial analyses.

77.     For example, in connection with BofA Merrill Lynch's *Discounted Cash Flow Analysis* ("DCF") of Bojangles', the Proxy Statement states:

> BofA Merrill Lynch performed a discounted cash flow analysis of the Company to calculate the estimated present value of the standalone unlevered, after-tax free cash flows that the Company was forecasted to generate from the fourth fiscal quarter of 2018 through fiscal year 2023, assuming refranchising, based on the projections and public filings.

Proxy Statement at 54.   The Proxy Statement fails, however, to disclose the standalone unlevered, after-tax free cash flows that the Company was forecasted to generate from the fourth fiscal quarter of 2018 through fiscal year 2023.

78.     The omission of this information renders the statements in the "Projected Financial Information" and "Opinions of Financial Advisors" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning BofA Merrill Lynch's and Houlihan Lokey's Financial Analyses***

79.     The Proxy Statement describes BofA Merrill Lynch's and Houlihan Lokey's fairness opinions and the various valuation analyses performed in support of their opinions.

However, the descriptions of BofA Merrill Lynch's and Houlihan Lokey's fairness opinions and analyses fail to include key inputs and assumptions underlying these analyses. Without this information, as described below, Bojangles' public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on BofA Merrill Lynch's and Houlihan Lokey's fairness opinions in determining whether to vote in favor of the Proposed Transaction or seek appraisal. This omitted information, if disclosed, would significantly alter the total mix of information available to Bojangles' stockholders.

80.   With respect to BofA Merrill Lynch's *DCF*, the Proxy Statement fails to disclose: (i) the Company's standalone unlevered, after-tax free cash flows for the fourth fiscal quarter of 2018 through fiscal year 2023, assuming refinancing, that BofA Merrill Lynch utilized in its analysis; (ii) the financial metric BofA Merrill Lynch applied perpetuity growth rates ranging from 1.0% to 2.0% to in order to derive the terminal value; (iii) Bojangles' net debt; and (iv) quantification of the inputs and assumptions underlying the discount rate range of 9.0% to 11.0%.

81.   With respect to BofA Merrill Lynch's *Selected Public Companies Analysis*, the Proxy Statement fails to disclose: (i) the Company's 2019 estimated EBITDA (assuming that the Company refranchises 30 stores in 2018) utilized in the analysis; and (ii) any benchmarking analyses for Bojangles' in relation to the selected companies analyzed by BofA Merrill Lynch.

82.   With respect to BofA Merrill Lynch's *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose: (i) the individual multiples and financial metrics for each of the selected transactions analyzed by BofA Merrill Lynch in the analyses; (ii) the Company's last twelve months estimated adjusted EBITDA as of September 30, 2018 (without refranchising) utilized in the analysis.

83.     With respect to Houlihan Lokey's *DCF*, the Proxy Statement fails to disclose: (i) the financial metric Houlihan Lokey discounted back to present value which formed the basis of its analysis and, to the extent not already disclosed, the values of that metric over the projection period; (ii) quantification of the inputs and assumptions underlying the discount rate range of 8.5% to 9.5%.

84.     With respect to Houlihan Lokey's *Selected Companies Analysis*, the Proxy Statement fails to disclose: (i) Bojangles' estimated adjusted EBITDA for each of the last twelve months ("LTM"), the next fiscal year, and the year following the next fiscal year, utilized by Houlihan Lokey in its analysis; (ii) any benchmarking analyses for Bojangles' in relation to the selected companies analyzed by Houlihan Lokey.

85.     With respect to Houlihan Lokey's *Selected Transactions Analysis*, the Proxy Statement fails to disclose: (i) Bojangles' LTM Adjusted EBITDA utilized by Houlihan Lokey in its analysis; and (ii) any benchmarking analyses for Bojangles' in relation to the target companies analyzed by Houlihan Lokey.

86.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

87.     The omission of this information renders the statements in the "Opinions of Financial Advisors" and "Projected Financial Information" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

88.     The Proxy Statement omits material information relating to the sale process leading up to the Proposed Transaction.

89.     In connection with the sale process, the Proxy Statement states that "[t]hroughout August and early September 2018, the Company negotiated confidentiality agreements with the parties approached by BofA Merrill Lynch . . . .   The Company ultimately executed 22 confidentiality agreements (including with Durational, Strategic A, Sponsor B, Sponsor C, and Sponsor D)."  Proxy Statement at 39.  The Proxy Statement fails, however, to expressly indicate whether the confidentiality agreements Bojangles' entered into with each of these 22 potential acquirers are still in effect and/or contain "don't ask, don't waive" standstill provisions that are presently precluding these potential bidders from making a topping bid for the Company.

90.     The disclosure of the existence and terms of any confidentiality agreements Bojangles' entered into with any other party is crucial to Bojangles' stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

91.     The omission of this information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

**_Material Omissions Concerning Potential Conflicts of Interest of BofA Merrill Lynch and Company Insiders_**

92.     The Proxy Statement fails to disclose material information concerning potential conflicts of interest faced by one of the Company's financial advisors, BofA Merrill Lynch.

93.     For example, the Proxy Statement sets forth that:

BofA Merrill Lynch and its affiliates in the past have provided, currently are providing, and in the future may provide investment banking, commercial banking and other financial services to the Company and have received or in the future may receive compensation for the rendering of these services, including (i) having acted or acting as a sole lead arranger and sole book runner on, and as a lender under, certain term loans and facilities for the Company, (ii) having acted as a joint book runner on a follow-on equity offering for the Company, and

(iii) having provided or providing certain treasury and trade management services and products to the Company. From October 1, 2016 through September 30, 2018, BofA Merrill Lynch and its affiliates derived aggregate revenues from the Company and its subsidiaries of approximately $4.0 million for investment and corporate banking services.

In addition, BofA Merrill Lynch and its affiliates in the past have provided, currently are providing, and in the future may provide investment banking, commercial banking and other financial services to Advent International Corporation and certain of its affiliates and portfolio companies and have received or in the future may receive compensation for the rendering of these services, including (i) having acted or acting as financial advisor to Advent International Corporation and/or certain of its affiliates and portfolio companies in connection with certain mergers and acquisitions transactions, (ii) having acted or acting as administrative agent, collateral agent, arranger, book runner for, and/or as a lender to, Advent International Corporation and/or certain of its affiliates and portfolio companies in connection with the financing for various acquisition transactions and for various term loans, letters of credit and credit facilities, (iii) having provided or providing certain commodity, derivatives and foreign exchange trading services to Advent International Corporation and/or certain of its affiliates and portfolio companies, and (iv) having provided or providing certain treasury and trade management services and products to Advent International Corporation and/or certain of its affiliates and portfolio companies. From October 1, 2016 through September 30, 2018, BofA Merrill Lynch and its affiliates derived aggregate revenues from Advent International Corporation and its affiliates (excluding the Company) of approximately $60.0 million for investment and corporate banking services.

*Id.* at 56.

94.    However, the Proxy Statement fails to disclose any services BofA Merrill Lynch and its affiliates have provided to Durational and its affiliates, and the amount of compensation BofA Merrill Lynch and its affiliates received for such services.

95.    Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

96.    The Proxy Statement also fails to disclose material information concerning potential conflicts of interest faced by Bojangles' insiders.

97.     For example, the November 6, 2018 press release announcing the Proposed Transaction quotes Durational's Managing Partner, Eric Sobotka, as stating: "We have admired the brand and its high quality and craveable food for years, and ***we look forward to partnering closely with the employees*** and franchisees to drive its future growth and continued success." Emphasis added.

98.     The Proxy Statement, however, fails to disclose whether any of Bojangles' executive officers or directors is continuing their employment following consummation of the Proposed Transaction, as well as the details of all employment and retention-related discussions and negotiations that occurred between Durational and Bojangles' executive officers, including who participated in all such communications, when they occurred and their content.  The Proxy Statement further fails to disclose whether any of Durational's prior proposals or indications of interest mentioned management retention in the combined company or the purchase of or participation in the equity of the surviving corporation.

99.     The omission of this information renders the statements in the "Opinion of Financial Advisors," "Background of the Merger," and "Interests of Bojangles' Directors and Executive Officers in the Merger" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

100.    The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

101.    Plaintiff repeats all previous allegations as if set forth in full.

102.    During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

103.    By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the Company's financial projections, the financial analyses performed by the Company's financial advisors, the background process leading to the Proposed Transaction, and potential conflicts of interest faced by one of the Company's financial advisors and Company insiders.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

104.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or whether to seek to exercise their appraisal rights.

105.    By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

106.    Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

107.    Plaintiff repeats all previous allegations as if set forth in full.

108.    The Individual Defendants acted as controlling persons of Bojangles' within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Bojangles', and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

109.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

110.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

111.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.   The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

112.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

113.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of defendants' conduct, Bojangles' stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Bojangles', and against defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to

Bojangles' stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and

setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange

Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for

Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  December 14, 2018                    **O'KELLY ERNST & JOYCE, LLC**

                                            By   */s/ Ryan M. Ernst*
                                                 Ryan M. Ernst (#4788)
                                                 901 N. Market St., Suite 1000
                                                 Wilmington, DE 19801
                                                 Tel.: (302) 778-4000
                                                 Email: rernst@oelegal.com

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly K. Moran
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Tel: (212) 308-5858
Fax: (212) 486-0462
Email: fortunato@bespc.com

*Attorneys for Plaintiff*